AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Northern District of California

United States of America
v.
JISBAR ARTEAGA

*Defendant(s)*

Case No. 4:25-mj-70919 MAG

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 1, 2025; April 14, 2025; June 9, 2025 in the county of Alameda in the Northern District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| - 21 U.S.C. § 841(a)(1) and (b)(1)(C)<br>- 21 U.S.C. § 841(a)(1) and (b)(1)(B)(viii) | One count of possession with intent to distribute and distribution of a mixture or substance containing a detectable amount of fentanyl; Two counts of possession with intent to distribute and distribution of 50 grams or more of methamphetamine, its salts, isomers, or salts of its isomers |

**FILED**

Jul 29 2025

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

This criminal complaint is based on these facts:

Please see attached affidavit of DEA Task Force Officer Braden Lyons.

☑ Continued on the attached sheet.

/s/
*Complainant's signature*

Braden Lyons, Task Force Officer, DEA
*Printed name and title*

Approved as to form /s/
AUSA EMILY R. DAHLKE

Sworn to before me by telephone.

Date: 07/28/2025

Kandis Westmore
*Judge's signature*

City and state: Oakland, California

Hon. Kandis A. Westmore, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, BRADEN LYONS, a police officer with the San Francisco Police Department serving as a Task Force Officer with the Drug Enforcement Administration, having been duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1. I make this affidavit in support of an application under Rule 4 of the Federal Rules of Criminal Procedure for a criminal complaint and arrest warrant charging Jisbar ARTEAGA (hereafter "ARTEAGA") with one count of possession with intent to distribute and distribution of a mixture or substance containing a detectable amount of fentanyl on or about April 1, 2025, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and two counts of possession with intent to distribute and distribution of 50 grams or more of methamphetamine, its salts, isomers, or salts of its isomers, on or about April 14, 2025 and June 9, 2025, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(viii), all in Oakland, California, in the Northern District of California. In each case, ARTEAGA sold controlled substances to undercover law enforcement officers in Oakland.

**SOURCES OF INFORMATION**

2. The facts in this affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other agents, officers, and witnesses. Where statements made by other individuals (including other Special Agents and law enforcement officers) are referenced in this Affidavit, such statements are described in sum and substance and in relevant part. Similarly, where information contained in reports and other documents or records is referenced in this Affidavit, such information is also described in sum and substance and in relevant part.

3. Because this Affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint and arrest warrant, I have not included every fact known to me about this case. Rather, I have set forth only the facts that I believe are necessary to

support probable cause for a criminal complaint and arrest warrant. This Affidavit reflects my current understanding of facts related to this investigation. My understanding of the facts and circumstances of the case may evolve as the investigation continues.

## AFFIANT BACKGROUND

4. I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, the narcotics offenses enumerated in Title 21 of the United States Code.

5. I am employed by the San Francisco Police Department as a Police Officer and have been so employed since October 2017. I am currently assigned to SFPD's Narcotics Division, which investigates narcotics trafficking offenses. I am also a Task Force Officer for the Drug Enforcement Administration within its San Francisco Divisional Office in California. I have been assigned as a DEA TFO since April 2022.

6. I graduated from the SFPD academy in June 2018. In the police academy, I received 40 hours of narcotics-related training. I also attended the SFPD Detective School where I received additional narcotics investigations training. The training curriculum covered all aspects of drug investigations, including identification of various types of controlled substances, physical surveillance, utilization of confidential sources, interview techniques, undercover operations, and the general operation of drug trafficking organizations.

7. The following is a list of courses I have successfully completed that are relevant to my job duties, including narcotics-related arrests, investigations, and search warrants: Search Warrant Fundamentals (POST Certified-DOJ); Robert Presley Institute of Criminal Investigation (ICI) 80-hour Core Course; Cellphone Use in Narcotic Investigations (HIDTA); Gangs and Narcotics (HIDTA); Search Warrants and Narcotics Investigations (HIDTA); Northern California Law Enforcement Opioid Conference & Training 2021 (Rx Safe Marin); Confidential Informant Operations & Safety (HIDTA); Fentanyl and Other Synthetic Opiates (Midwest Counter-Drug Training Center); Drug Identification (Professional Law Enforcement Training –

Texas); and the 57th Annual California Narcotics Officers Association Training Institute and LE Enforcement Summit.

8. During my employment as a police officer, I have participated in many controlled substance investigations either as a case agent or in a supporting role. I have debriefed confidential sources and witnesses who provided personal knowledge about drug trafficking organizations. In addition, I have discussed with numerous law enforcement officers and confidential sources the methods and practices used by drug traffickers. I have also participated in many aspects of drug investigations, including, but not limited to, undercover operations, telephone toll analysis, records research, and physical surveillance. I have also assisted in the execution of numerous federal and state search and arrest warrants relating to illegal narcotics activity, in which suspects were arrested and controlled substances were seized.

9. Through my training and experience, and through my conversations with other law enforcement officers and agents who conduct drug investigations, I have become familiar with drug traffickers' methods of operation, including, but not limited to, the manufacturing, distribution, storage, and transportation of controlled substances, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds.

10. I have also had discussions with other law enforcement officers and confidential informants about the packaging and preparation of narcotics, the methods of operation, and security measures that are often employed by narcotics traffickers. I have examined documentation of various methods in which fentanyl and methamphetamine and other illicit drugs are smuggled, transported, possessed with intent to distribute, and distributed.

11. I am familiar with the facts and circumstances of the investigation through my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the statement is not being recounted verbatim, but instead only in substance and in part. Facts not set forth herein, or in any attached exhibits, are not being relied on in reaching my conclusion that the requested order should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

## APPLICABLE STATUTES

12. **Possession of Controlled Substance with Intent to Distribute.** Under Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), it is unlawful for any person to knowingly or intentionally possess with intent to distribute a federally controlled substance. Under 21 C.F.R. § 1308.12, methamphetamine a Schedule II controlled substance.

13. **Possession with Intent to Distribute 50 Grams or More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine.** Under Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(viii), it is unlawful for any person to knowingly or intentionally possess with intent to distribute 50 grams or more of a mixture and substance containing a detectable amount of methamphetamine, its salts, isomers or salts of its isomers.

## STATEMENT OF PROBABLE CAUSE

### A. Initial Contact with ARTEAGA

14. Since approximately May of 2024, the DEA Metro Task Force has been investigating the user(s) of telephone number 510-254-1516 ("the number"). In May of 2024, DEA conducted multiple undercover purchases from the user of the number, who at the time, was identified as Delver Sandres-Cruz. As a result of his drug trafficking, Delver Sandres-Cruz was arrested and criminally prosecuted. While Delver Sandres-Cruz was in custody, the phone number remained active. I know in my training and experience that is it common for drug traffickers to share phones and phone numbers in furtherance of drug trafficking.

15. On March 20, 2025, while Delver Sandres-Cruz was in custody, an undercover officer ("UC") with the DEA contacted the number to arrange a purchase of fentanyl. The user of the number negotiated a future purchase of fentanyl with the UC. Based on conversations between the UC and the user of the number, it was determined the user of the number could provide the UC with ounce quantities of fentanyl and methamphetamine. Additionally, the user of the number told the UC he lived in West Oakland, CA. The UC arranged an undercover

purchase of fentanyl with the user of the number for an ounce of fentanyl priced at $700/per ounce.

**B. <u>Count One: April 1, 2025 -ARTEAGA Sells the UC Approximately 27.7 Grams of Fentanyl in Oakland.</u>**

16. On March 31, 2025, the UC sent a text message to the number, asking where the user of the number and the UC would meet on April 1, 2025. The user of the number told the UC to meet at 2824 Helen St., Oakland, CA. The UC told the user of the number that he would meet the UC at 2:00 P.M. after he got off work.

17. At approximately 2:00 p.m. on April 1, 2025, law enforcement established surveillance in the vicinity of 2824 Helen St., Oakland, CA.

18. At approximately 2:03 p.m., the UC arrived to the vicinity of 2824 Helen St., Oakland, California. The UC texted the number, saying that the UC was here in the undercover vehicle.

19. At approximately 2:08 p.m. on April 1, 2025, I observed a Hispanic male, later identified as Jisbar ARTEAGA, wearing a navy-blue baseball hat, grey sweatshirt, black shorts, and sandals walking eastbound on Peralta St. approaching Helen St. with his cellphone in his hand.

20. At approximately 2:11 p.m. on April 1, 2025, DEA TFO Scafani observed ARTEAGA enter the UC vehicle. ARTEAGA and the UC engaged in friendly conversation. ARTEAGA provided the UC with approximately 27.7 grams of fentanyl in exchange for $700 (U.S. currency - DEA Official Advanced Funds). The interaction was video recorded.

21. At approximately 2:13 PM, ARTEAGA exited the UC vehicle and began walking northbound on Helen St. before ultimately walking westbound on 32nd St.

22. At approximately 2:18 p.m. law enforcement observed ARTEAGA ascend a set of stairs into 1562 32 St., Oakland, CA and enter the premise.

23. After the controlled buy, TFO Scafani conducted a records query of San Francisco County Sheriff's Office booking photographs. TFO Scafani was able to positively

identify the individual who sold fentanyl to the UC and the user of the number (as Jisbar ARTEAGA). TFO Scafani knows ARTEAGA from prior law enforcement contacts and was able to compare the UC video recording to booking photographs to conclude that the unidentified male was in fact ARTEAGA.

24. The suspected fentanyl purchased by the UC on April 1, 2025, was shipped to the DEA Western Regional Lab where confirmatory analysis and testing was conducted by DEA Drug Analysts. The suspected fentanyl weighed 27.7 grams net and tested confirmatory positive for the presence of fentanyl

**C. Count Two: April 14, 2025 – ARTEAGA Sells the UC Approximately 85.9 grams of Methamphetamine in Oakland.**

25. On Wednesday, April 9, 2025, the UC sent a text message to ARTEAGA at the number. The UC arranged to buy two ounces of methamphetamine for $300 USD. The UC told ARTEAGA that he (the UC) would be available on Monday (referring to April 14, 2025).

26. On Sunday, April 13, 2025, the UC contacted ARTEAGA via text message, asking if the UC and ARTEAGA could meet at 3:00 p.m. the following day. ARTEAGA replied that, "…it is very expensive" (believed to be referring to the crystal methamphetamine). ARTEAGA told the UC that he could sell the UC "two for 400" (believed to be two ounces for $400).

27. On Monday, April 14, 2025, at approximately 10:54 a.m., the UC agreed and asked if ARTEAGA could meet the UC at 2:00 p.m. ARTEAGA agreed to meet the UC for a drug sale. The UC asked where ARTEAGA would like to meet and ARTEAGA provided the address of 1800 Wood Street, Oakland, CA 94607.

28. On April 14, 2025, at approximately 1:45 p.m., law enforcement established surveillance in the area of 1800 Wood Street, Oakland, CA and 1562 32nd Street, Oakland, CA. Law enforcement agents observed a black Toyota Corolla (CA license plate 5MJH438) parked

inside the gate of the driveway to 1562 32nd Street, Oakland, CA. The black Toyota Corolla is registered to Jhony Josue Meza out of 1821 Chestnut Ave, Apt A in Oakland, CA.

29. At approximately 2:08 p.m., law enforcement observed ARTEAGA exit the residence of 1562 32nd Street, Oakland, CA wearing a light blue shirt and navy-blue shorts. ARTEAGA was seen mounting a motorized electric scooter and traveling in the direction of 1800 Wood Street, Oakland, CA.

30. At approximately 2:28 p.m., law enforcement observed ARTEAGA approach the passenger side window of the UC vehicle. ARTEAGA then sold the UC approximately two ounces of suspected methamphetamine in exchange for $400. After the sale, the UC asked ARTEAGA if he, "had any more drugs for sale." ARTEAGA implied that he had more methamphetamine and would return in five minutes.

31. At approximately 2:32 p.m., I observed ARTEAGA leave 1800 Wood Street, Oakland, CA and ride his scooter to the area of 32nd Street and Ettie Street. Other law enforcement agents observed ARTEAGA enter the front door on the second floor of 1562 32nd Street, Oakland, CA. At approximately 2:39 p.m., law enforcement agents saw ARTEAGA exit his residence wearing a grey sweatshirt over his light blue shirt. ARTEAGA mounted his scooter and rode towards 1800 Wood Street.

32. At approximately 2:35 p.m., law enforcement observed an unknown Hispanic male exit the bottom floor of the residence at 1562 32nd Street, Oakland, CA and leave in the black Toyota sedan parked in the driveway of the residence.

33. At approximately 2:43 p.m., law enforcement observed ARTEAGA approach the passenger side window of the UC vehicle. ARTEAGA sold the UC approximately one ounce of methamphetamine for $200.

34. At approximately 2:59 p.m., law enforcement observed the black Toyota bearing CA plate 5MJH438 return to the residence of 1562 32nd Street, Oakland, CA being driven by an unknown Hispanic male and occupied by two more unknown Hispanic males. Law enforcement

agents observed the unknown Hispanic males exit the black Toyota and enter the front door of the first floor of 1562 32nd St. Oakland, CA.

35. The two suspected baggies of methamphetamine purchased from ARTEAGA on April 14, 2025, were shipped to the DEA Western Regional Lab where confirmatory analysis and testing was conducted by DEA Drug Analysts. The suspected methamphetamine exhibits weighed 28.6 grams net and 57.3 grams net, respectively, and tested confirmatory positive for the presence of methamphetamine.

**D. June 9, 2025 – ARTEAGA Sells the UC Approximately 137.3 Grams of Methamphetamine in Oakland.**

36. On Monday, June 9, 2025, the UC (hereafter "UC-1"), contacted ARTEAGA at the number used to arrange the prior sales. ARTEAGA agreed to sell methamphetamine to another DEA undercover officer ("UC-2").

37. On June 9, 2025, at approximately 11:15 a.m. law enforcement again established surveillance in the area of 1562 32nd St., Oakland, CA.

38. At approximately 11:22 a.m. that day, UC-1 sent a text message to the number and said, "hey Pacha my friend wants the crystal - can you get it?" (It should be noted that ARTEAGA previously introduced himself to UC-1 as "Pacha,".)

39. UC-1 sent a text message to the number and asked, "is it still $200 an ounce?" ARTEAGA texted back, "Yes it is more expensive but I'm going to give it a go." UC-1 said, "ok thank you. My friend wants 5 ounces. Can you get it?" ARTEAGA responded, "It's okay and when he comes to pick them up". UC-1 asked ARTEAGA if ARTEAGA could meet UC-1 and UC-2 at 12:15 PM. ARTEAGA said, "Well let me see or call my friend." UC-1 told ARTEAGA that UC-1 was near Emeryville and had to work soon.

40. At approximately 11:43 a.m. on June 9, ARTEAGA texted UC-1, stating: "Aurita mela is going to bring. When I have them I'll let you know." Based on my training and experience, I know that it is common for Spanish speaking drug traffickers to utilize internet or automatic language translation software when communicating with English speaking drug

purchasers via text message. Based on my training and experience, knowledge of this investigation and the context of the communications and prior drug sales between ARTEAGA and UC-1, it is my belief that ARTEAGA may have been utilizing language translation software for translating Spanish to English to communicate with UC-1. I believe the sentence, "Aurita mela is going to bring. When I have them I'll let you know," may have been intended to communicate to UC-1 something along the lines of "right now someone is going to bring it. When I have them (the drugs), I'll let you know."

41. At 11:56 a.m., UC-1 asked "Are they coming now? How much time do you think it will take to get?" ARTEAGA responded, "Well before 12:45. Yala I'm going to have here."

42. UC-1 told ARTEAGA that UC-1 and UC-2 were ready and had the money. At 12:34 p.m., ARTEAGA stated, "It's coming."

43. At 12:52 p.m., UC-1 called the number and asked "Hey Pacha, what's it looking like? Are you able to get it?" ARTEAGA responded, "10 minutes." UC-1 told ARTEAGA that he and UC-2 had the money. UC-1 told ARTEAGA that UC-1's friend (UC-2) was there too and still wanted the five ounces. UC-2 confirmed to ARTEAGA on the phone that UC-2 still wanted to buy five ounces.

44. At approximately 11:54 a.m., law enforcement observed two unidentified Hispanic male subjects exit the first-floor front door of the premise located at 1562 32nd Street and enter a blue 2007 Honda Accord (LP: 5XUR214) that was previously parked within a gate at the residence. The Honda drove eastbound on 32nd St. away from the premise. The blue Honda Accord is registered to Darwin Nunez at 1562 32nd St. in Oakland, CA.

45. At approximately 12:56 p.m., law enforcement observed the blue 2007 Honda Accord return to 1562 32nd St., Oakland, CA. Law enforcement observed the same two unidentified Hispanic males exit the Honda and reenter the premise at 1562 32nd St. One of the unidentified Hispanic males was in possession of a what appeared to be a weighted down brown paper bag.

46. At approximately 12:58 p.m., ARTEAGA sent UC-1 a text message that said, "I already have them," and sent a photo to UC-1 with the address "2824 Helen Street". UC-1 responded, "Ok give me 10 minutes,". ARTEAGA responded "Ok".

47. I believe, based on my training and experience, the statements made by ARTEAGA, the timing of the communications between UC-1 and UC-2 and ARTEAGA, and the physical observations made by law enforcement surveillance, that the unknown Hispanic male subjects, utilizing the blue Honda Accord, acted as couriers on ARTEAGA's behalf to procure narcotics for ARTEAGA to sell to the UCs.

48. At approximately 1:13 p.m., law enforcement observed ARTEAGA exit the second story front door to the premise of 1562 32nd St. wearing a grey hooded sweatshirt, black jeans, and red shoes.

49. At approximately 1:14 p.m., UC-1 texted ARTEAGA, "here white van". Shortly after, UC-1 observed ARTEAGA walking on the east sidewalk on Helen Street, and UC-1 called ARTEAGA over to the UC vehicle and asked, "What took so long?". ARTEAGA walked to the passenger side window. UC-2 greeted ARTEAGA. UC-1 told ARTEAGA that UC-2 had the money. UC-1 confirmed the price of $200 per ounce, and UC-2 confirmed the quantity of five ounces. UC-2 counted the money for ARTEAGA. ARTEAGA gave UC-2 approximately five ounces of suspected methamphetamine in exchange for $1000. UC-1 asked ARTEAGA if ARTEAGA was able to get a pound (of methamphetamine). ARTEAGA said no.

50. UC-2 asked if ARTEAGA also sold "fetty" (a common street name for fentanyl). ARTEAGA said, "Yeah." UC-1 asked if ARTEAGA had "clean" (a common street name for fentanyl that contains fewer cutting agents and has a stronger concentration of fentanyl). ARTEAGA explained to UC-2 that he sold fentanyl for $600 an ounce. UC-2 asked ARTEAGA if she could text ARTEAGA in the future to arrange narcotics transactions, to which ARTEAGA answered, "yes."

51. The suspected methamphetamine exhibit purchased by UC-1 and UC-2 on June 9, 2025, were shipped to the DEA Western Regional Lab where confirmatory analysis and testing

was conducted by DEA Drug Analysts. The suspected methamphetamine exhibits weighed 137.3 grams net and tested confirmatory positive for the presence of methamphetamine.

**SEALING REQUEST**

52. Based on my training and experience, the disclosure of the existence of his Affidavit, the Complaint, arrest warrant, and/or all related documents may cause other co-conspirators, known and unknown at this time, to destroy evidence or to conceal ongoing criminal activity, jeopardizing the progress of this ongoing investigation. The disclosure of these documents may also jeopardize the safety of ARTEAGA and/or cause him to flea from prosecution. I therefore request that the Court seal this Affidavit, the Complaint, the arrest warrant, and all related documents.

**CONCLUSION**

53. On the basis of my training and experience, my participation in this investigation and the information summarized above, there is probable cause to support a criminal complaint alleging the following Counts:

**Count One:** On or about April 1, 2025, Jisbar Osiel ARTEAGA distributed and possessed with intent to distribute a mixture or substance containing a detectable amount of fentanyl, in the Northern District of California, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

**Count Two:** On or about April 14, 2025, Jisbar Osiel ARTEAGA, distributed and possessed with intent to distribute 50 grams or more of a mixture or substance containing methamphetamine, its salts, isomers, or salts of its isomers, in the Northern District of California, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(viii).

**Count Three:** On or about June 9, 2025, Jisbar Osiel ARTEAGA, distributed and possessed with intent to distribute 50 grams or more of a mixture or substance containing methamphetamine, its salts, isomers, or salts of its isomers, in the Northern District of California, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(viii).

________________/s/___________________
BRADEN LYONS
Task Force Officer
Drug Enforcement Administration

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P 4.1 and 4(d) on this 28th day of July 2025.

____________________________________________
HONORABLE KANDIS A. WESTMORE
United States Magistrate Judge